## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

ROBIN GRAHAM,                        )
                                     )
    Plaintiff,               )
                                     )
    vs.                      )     Case No. 1:14CV88 CDP
                                     )
CAROLYN COLVIN                       )
*Acting Commissioner* ,              )
                                     )
    Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Robin Graham's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et*

*seq.* Graham claims she is disabled because she suffers from irritable bowel

syndrome (IBS), arthritis, interstitial cystitis (IC), and fibromyalgia. After a

hearing, the Administrative Law Judge concluded that Graham was not disabled.

Because I cdonclude that the ALJ's decision was based on substantial evidence on

the record as a whole, I affirm.

### I.    Procedural History

Graham filed her application for disability insurance benefits on January 14,

2011. She alleged an onset date of August 22, 2009. When her application was

initially denied on April 15, 2011, Graham requested a hearing before an administrative law judge.  She then appeared, with counsel, via video conference, at an administrative hearing on January 15, 2013.  Graham and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Graham's application on February 8, 2013, and she appealed to the Appeals Council.  On April 21, 2014, the Council denied Graham's request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Graham now appeals to this court.  She alleges that the ALJ erred by: (1) making a decision contrary to the weight of the evidence; (2) failing to properly consider opinion evidence; and (3) failing to properly consider all of plaintiff's severe impairments at step 2 of the ALJ's analysis.

## II.     **Evidence Before the Administrative Law Judge**

### ***Medical Records Before Period of Alleged Disability***

In the medical records before the ALJ in 2006 to 2009, the period before the onset of Graham's alleged disability, Graham was seeing her primary care physician, Dr. Anthony Keele.  She began seeing Dr. Keele in September 2006.  She told Dr. Keele that she suffered from a bladder disease in her initial visit on September 6, 2006, and Dr. Keele diagnosed IC, IBS, and fatigue.  (Tr., p. 377.)

Graham saw Dr. Keele once more in September 2006 and then one time in October 2006; she stated no new concerns and that her urination was better. Graham's only concern was she urinated more at night. (Tr., pp. 375-76.)

On January 22, 2007, Graham complained of more frequent bladder pain that was worse than normal. (Tr., p. 371.) Again in March and April 2007, Graham saw Dr. Keele, stating new concerns of bladder pain and asking about different treatments that might be available for her condition. They discussed the possible use of Oxytrol patches.[1] (Tr., pp. 368-69.) From May 2007 to October 2007, Graham saw Dr. Keele five times, with complaints such as cramps, fatigue, achiness, and burning during frequency problems; he continued the treatment with medicine already prescribed. During some of these visits she indicated she was having pain in her neck, hips and legs. (Tr., pp. 362-67.)

In January 2008, Graham wanted to discuss "bladder pain" that she claimed was persistent, possible depression and problems sleeping. (Tr., p. 360.) Graham saw Dr. Keele for a foot injury in early 2008, and did not complain of pain and constipation until April 2008. In April she also complained of pain in her hip and leg. (Tr., pp. 356-59.) Throughout the rest of 2008, Graham had only a few

---

[1] Oxytrol Transdermal, generic name is Oxybutynin. Oxbutynin is used to treat an overactive bladder. BY relaxing the muscles in the bladder, oxybutynin improves symptoms such as inability to control urination (incontinence), feeling that one has to urinate (urgency), and having to go to the bathroom often (frequency). WebMD, "Drugs & Medications," http://www.webmd.com/drugs/2/drug-75024/oxytrol-td/details (last visited March 30, 2015).

complaints concerning her fatigue, muscle spasms, and tenderness. (Tr., pp. 345-55.)

In Graham's first visit to Dr. Keele in 2009, she had no new concerns noted in her chart. (Tr., p. 344.) The next two visits in March and February 2009, Graham had complaints concerning flu symptoms. (Tr., pp. 342-43.) On April 23, 2009, Graham went to Dr. Keele and complained of increased fatigue, joint and muscle pain, problems emptying bladder, and chest tightening. (Tr., p. 341.) While Graham saw Dr. Keele six more times throughout 2009, she did not state any new problems concerning her IC or fibromyalgia, even after the alleged onset of August 22, 2009. (Tr., pp. 333-40.)

### *Medical Records During Period of Alleged Disability*

Graham alleged a disability onset date of August 22, 2009. Graham continued to see Dr. Keele after this date, but in 2009 Graham only saw him for medicine refills and testosterone shots. (Tr., pp. 333-38.)

On October 17, 2009, Graham began seeing urologist, Dr. Anthony Steele. In this initial visit, Graham discussed her history of symptoms and treatments, and effects on her daily routine. Upon a physical examination, most pain areas were within normal limits with no tenderness, except 1 cm area of tenderness on her vulva. Dr. Steele diagnosed IC, IBS, fibromyalgia, and noted that for treatment of fibromyalgia Graham should seek care of a rheumatologist. Dr. Steele prescribed

Cystoprotek[2] and continuation of oxytrol. He discussed the option of treatment through bladder installations.[3] (Tr., pp. 378-80.) Graham received her first bladder installation at her November 2, 2009, appointment with Dr. Steele. Dr. Steele again recommended Graham see a rheumatologist, and gave Graham Vivelle patches[4] to sample. (Tr., pp. 381-82.)

Graham received two bladder installations on November 9, 2009, and November 18, 2009. (Tr., pp. 383-84.) Additionally, Graham had a consultation with Dr. Susan Hoffstetter in the vulvar and vaginal disease clinic on November 18, 2009, complaining of dyspareunia and vulvar pain. Dr. Hoffstetter diagnosed dyspareunia and vulvodynia, and prescribed the use of Crisco or olive oil massaging multiple times a day and kegal exercises. (Tr., pp. 385-89.)

Although the medical records are not entirely clear, it appears that Graham saw a rheumatologist on November 24, 2009, Dr. Rama Bandlamudi, who examined her and ordered x-rays. (Tr., pp. 529-533).[5] She complained of pain all over her body over the past five years, with fatigue. The records contain a note stating: "18/18 tender points pos for FMS." (Tr. P. 530).

---

[2] Cystoprotek is a dietary supplement that promotes bladder health and supports the protective layer of the bladder; is available over the counter. http://www.cysto-protek.com/.

[3] Bladder installations involved the placement of medicine directly into the bladder.

[4] Vivelle patch is an estrogen hormone used to treat conditions due to menopause or other conditions determined by doctor. Drugs.com, "Vivelle Patch," http://www.drugs.com/cdi/vivelle-patch.html (last visited April 22, 2015).

[5] Counsel's argument to the Appeals Council says these are records of Dr. Bandlamudi and that he is a rheumatologist. (Tr., p. 299). Plaintiff's Brief in Support of the Complaint says these are records of Dr. Keele. (ECF. # 16, at p. 9).

In December 2009, Graham underwent another bladder instillation. She also had a consultation with Dr. Susan Barr, involving interstim treatment[6] for her IC, but did not proceed with the procedure at this visit. (Tr., p. 391.) This same month, Graham also had a consultation with Dr. Alex Befferler, a Gastroenterologist and Hepatologist. Dr. Befferler diagnosed constipation, interstitial cystitis, and fibromyalgia, and prescribed Align, for digestive care, and an increased prescription of Miralax. (Tr., pp. 396-97.)

In 2010, Graham visited Dr. Keele, her primary care physician, once a month in February, March, April, and May. (Tr., pp. 329-32.) These visits were for hormone injection shots, and in April to complain of congestion, sneezing, and drainage. In June 2010, Graham saw Dr. Keele twice, once for her hormone injection and the second time complaining of a bladder infection. Graham was prescribed Ciprodex, to help with the bladder infection. (Tr., pp. 401-02.)

On July 2, 2010, Graham saw Dr. Keele. She complained of dizziness and inability to turn head to either side, symptoms which began the day before. Dr. Keele gave Graham a Kenalog injection to help with swelling, and prescribed Meclizine to help with the dizziness. (Tr., pp. 403-04.)

---

[6] Interstim is a device, surgically implanted, to help control sacral nerves which control your bladder and bowel. This is a therapy used to treat overactive bladder and urinary retention. Medtronic, "What is Interstim Therapy?" http://www.medtronic.eu/your-health/constipation/about-the-device/what-is-it/ (last visited April 22, 2015).

In August 2010, Graham had two follow-up visits with Dr. Keele. The first was for a hormone injection and prescription refills. The second visit on August 30, 2010, was a follow-up for Graham's hypothyroidism and complaints of chest congestion and drainage. Graham then followed up on her hypothyroidism with Dr. Keele on October 4, 2010. (Tr., pp. 406-11.)

On October 13, 2010, Graham saw Dr. Keele. She complained of pain in her legs that had lasted several weeks and requested a Percocet refill. (Tr., pp. 413-14.) In November 2010, Graham again visited Dr. Keele complaining of insomnia, which Dr. Keele had already previously diagnosed. (Tr., pp. 415-16.) Graham then had two appointments with Dr. Keele in Decemeber 2010. The first visit she complained of low energy, fatigue, and sore throat. Dr. Keele's only prescriptions were to treat infections for the sore throat. (Tr., pp. 417-18.) At the second visit in December 2010, Graham again complained of insomnia, which Dr. Keele treated with previously prescribed medications. (Tr., pp. 419-20.)

In January 2011, Graham visited Dr. Keele twice complaining of congestion, drainage, fatigue, and sore throat. Dr. Keele prescribed medications for allergies and infections to help with these symptoms. (Tr., pp. 421-24.) Graham saw her primary care physician Dr. Keele again on March 2, 2011. She complained of insomnia and frequent and painful urination. The only new prescription Dr. Keele prescribed this visit was Advil cold and sinus. (Tr., pp. 436-37.)

In June 2011, Graham saw urologist Dr. Steele. Graham had a bladder instillation performed during this visit, her first since December 2009.  She also complained of problems with her fibromyalgia and pain.  Dr. Steele recommended a cystoscopy and hydrodistension to help with discomfort and also diagnosis since he had never scoped her before.  (Tr., pp. 461-68.)

Graham then followed up with Dr. Steele on August 12, 2011.  The treatment notes indicate that Graham had a cystoscopy and hydrodistention performed, which she said "helped quite a bit," but still thinks there are some problems.  (Tr., p. 474.)  Graham had a bladder instillation performed during this visit and Dr. Steele recommended she continue taking Cystoprotek over the counter.  (Tr., pp. 469-75.)

In September 2011, Graham saw another primary care physician, Dr. Richard Tipton.  Graham's chief complaints involved problems with hypothyroidism, IBS, and cystitis.  Treatment notes indicated that Graham had normal range of motion of musculoskeletal system.  Dr. Tipton' assessment recommended continued treatment with Dr. Steele for cystitis and Miralax to help with bowels.  (Tr., pp. 537-40.)

Graham first saw Dr. Di Valerio, a rheumatologist, in September 2011.  She reported a history of fibromyalgia syndrome and complained of musculoskeletal weakness, some numbness, chronic constipation, some left chest wall pain, and

myalgia type pain in her hips, low back, neck, shoulders, upper back, and pelvic region.  Upon Dr. Di Valerio's physical examination there was no musculoskeletal acute swelling.  Dr. Di Valerio diagnosed fibromyalgia syndrome and fatigue. (Tr., pp. 507-09.)  Graham saw Dr. Di Valerio again at the end of September 2011. She complained of left hip and legs hurting, with pain in left hip most severe that day, also stating she occasionally uses ibuprofen to help.  Upon Dr. Di Valerio's physical examination, there were no tenderness points and Graham had full and painless motion in all four extremities of her body.  (Tr., pp. 513-15.)

In October 2011, Graham visited Dr. Steele. Graham had a bladder instillation performed, and Dr. Steele said to continue with this plan of treatment because "patient doing well."  (Tr., 476-89.)  Graham also saw Dr. Tipton complaining of heart palpitations and sinus problems.  Graham's EKG looked normal and Dr. Tipton prescribed Claritin to resolve sinus problems.  (Tr., pp. 541-44.)

Graham saw rheumatologist Dr. Di Valerio again on November 2, 2011. She complained of pain all over body, swelling in hands, left hip and leg hurting, and right elbow pain due to a fall.  Dr. Di Valerio performed a physical examination, which showed no tenderness or swelling, range of motion as full and painless in all four extremities, and gait normal.  He prescribed Feldene and Mobic to help with the pain and inflammation caused from arthritis.  (Tr., pp. 517-19.)

On January 4, 2012, Graham visited Dr. Di Valerio, continuing to complain of pain all over body, and additionally left chest wall pain. Treatment records noted that Graham believed her symptoms seemed to change with the weather. Upon physical examination, records indicate that there were no tenderness points, swelling, or weakness, and range of motion was full and painless in all four extremities. (Tr., pp. 520-23.) Graham also visited Dr. Steele on January 17, 2012. Graham indicated she had some worsening of her IC since last instillation in October 2011, but that she felt the instillations and cystoprek helped. (Tr., p. 496.) She had a bladder instillation performed during this visit. (Tr., p. 504.)

In March 2012, Graham saw Dr. Di Valerio. She complained that her symptoms had flared up from weather and had been bad the last month. Graham claimed to receive partial relief from medications, but energy was not great and right elbow and both knees were hurting. Dr. Di Valerio's physical examination showed no tenderness, swelling or weakness, as well as full and painless range of motion in all four body extremities and normal gait. Despite this, the records also note positive bilateral tender points at elbows, shoulders, chest, base of neck, sacular areas, low back, hips, and knees. (Tr., pp. 524-26.)

In May 2012, Graham again visited Dr. Steele. She complained her fibromyalgia was acting up, along with IC and IBS, and came in to have an

instillation done.  Graham had a bladder instillation performed and she was scheduled for a repeat instillation.  (Tr., p. 553.)

On September 5, 2012, Graham visited Dr. Steele and had her follow-up bladder instillation performed.  (Tr., p. 563-64.)  That same month, Graham also visited Dr. Di Valerio.  She complained of dealing with chronic joint and muscle pain, not sleeping well, and having a lot of pain in both legs.  Graham also stated she was not doing well with pain medications.  Upon physical examination, positive tender points were found in her shoulders and elbows of her right and left upper extremities and in both knees.  All other areas had no tenderness or swelling, and had full and painless range of motion. (Tr., pp. 534-36.)  During this visit, Dr. Di Valerio also completed a physician's statement for a disabled license plate for the State of Missouri.  (Tr., p. 294.)

### ***Work Reports***

Graham completed a work history report on February 15, 2011.  She was employed as an eye doctor technician from March 2007 to October 2009, and had to stop working because of her medical condition.  Graham also worked as a pharmacy technician from September 2003 to 2006, she also did workers' compensation examinations at a doctor's office from September 1997 to August 2002.  Additionally, she served as a vision center technician from May 1996 to September 1997, and was a cashier from July 1994 to May 1996.  Graham reported

being sick most of the time she was at her last job as an eye doctor technician and experiencing increased pain and stress making it hard to work. She claimed to take this job believing she could work, especially since she had done this work in the past, but because of the problems she experienced at work she did not believe she could do a good job anymore. (*See* Tr., pp. 232-243.)

On May 6, 2011, Graham filled out another disability report. Although Graham stated she was continuing treatment and her conditions were affecting her daily activities, she reported no change or additional limitations to her conditions since her last report. (*See* Tr., pp. 285-290.)

### *Function Report*

Graham completed a function report on February 15, 2011. She lives with her husband, and describers her usual day involving house work, making breakfast, and caring for dogs, all of which depends on if she had a "bad night." On "good days" she can fix meals and care for her husband and grandchild, and feed and take the dog out. She reported not being able to shop all day, go for hikes, help in the yard, or exercise without pain. Graham reports her bladder and pain affect her ability to sleep. She could still do most personal care tasks, with some difficulty depending on pain level for the day.

Graham reported that she is able to fix sandwiches and frozen meals and do light house work, but has to take a lot of breaks. She described her mind

"wandering" and said that on occasion she could forget simple things like whether she took her pills for the day. Graham wrote that she gets out probably once a day if up to it, and goes shopping every couple of weeks with assistance from her husband. Graham reported no problems with handling money except that it might take longer to process the information. She also described no problems with driving and has a valid drivers' license.

Graham enjoys watching television, walking, shopping, and fishing. However, she describes many of the activities she used to enjoy and do are hindered by her condition and pain. She still tries to go to church and see friends and family, unless she is too tired or sick. Graham describes some limitations in her physical abilities, such as lifting only four to five pounds, bending hurts back, and standing hurts feet and legs, and these activities also being affected by the weather. She wrote that she got along well with authority figures, but does not handle stress or changes in routine well and experiences unusual behavior and fears. (Tr., pp. 251-63.)

### *Medical Source Statements*

Dr. Steele was Graham's treating urologist from October 2009 to September 2012. Dr. Steele completed a *Treating Medical Source Statement* on January 19, 2012. In this statement, Dr. Steele found that Graham's diagnosis was consistent with IC and that she suffered from symptoms such as: presence of urinary

urgency/frequency, pain the bladder, and pubic tenderness on physical examinations. However, Dr. Steele's statement stated there were no positive findings of this condition on urinalysis or a urine culture lab reports, nor did she have urinary incontinence.

Dr. Steele found that Graham suffered from some marked limitations in daily living including: Graham needing to urinate every 30 minutes, maintaining a strict dietary compliance, nocturia disrupting Graham's sleeping patterns, and experiences of pain interfering with Graham's attention and concentration. He further noted Graham's condition limited her physical activities with sitting being limited to 30 minutes, standing limited to 20 minutes, and walking limited to less than two hours. However, Dr. Steele did not find that Graham's condition affected her social functioning, or ability to lift or carry. As for other physical activities such as climbing, driving machinery, or pushing with upper and lower extremities, Dr. Steele noted that Graham could perform such tasks occasionally.

With the limitations noted by Dr. Steele, he concluded that Graham could not sustain a 40 hour work week, but if she was to work she would need unscheduled breaks in an 8 hour work day every 1-3 hours, on average of 20 minutes. Additionally, Dr. Steele reported that Graham would need a job with ready access to a bathroom and would miss work because of symptoms about 3

times a month. But Dr. Steele did would not need to clean up or change clothes following urinary incontinence during an 8 hour work day.  (Tr., pp. 451-55.)

Dr. Di Valerio, Graham's treating rheumatologist from September 2011 to January 2013, completed a *Treating Medical Source Statement* on March 7, 2012. Dr. Di Valerio found that Graham met the criteria for fibromyalgia and also suffered from fatigue and joint pain. His statement identified 16 tender points and bilateral pain, that is "constant and severe," in all areas of Graham's body.  Dr. Di Valerio found that factors such as changing weather, fatigue, movement/overuse, and stress could precipitate pain.  Dr. Di Valerio found that Graham's pain could frequently interfere with her attention and concentration, and that she had a marked limitation in her ability to deal with work stress.  He further noted that Graham's medicines could cause sedation and cognitive dysfunction.

In relation to Graham's physical activities, Dr. Di Valerio noted that she was limited to 10 minutes sitting, 10 minutes standing, less than two hours walking, and could only lift or carry 10 pounds or less.  Dr. Di Valerio further indicated that Graham could never climb, drive machinery, or do repetitive bending or twisting. Additionally, Dr. Di Valerio found that Graham had significant limitations in repetitive use of her hands, arms, or fingers, with only 5% of time in a workday to use hands and fingers and no ability to use arms for reaching in a work day.  He concluded that Graham could not sustain a 40 hour work week, and if she tried to

she would need 5 to 7 breaks a day, lasting 10 minutes each.  Also, Dr. Di Valerio noted that she would need to miss work more than three times a month.  Dr. Di Valerio stated that his answers on this statement applied to symptoms and limitations stemming from early 2007.  (Tr., pp. 456-60.)

Dr. Di Valerio also wrote a *Treating Source Statement* on January 9, 2013. In this statement he noted that Graham still suffers from fibromyalgia and "symptoms characterized by joint and muscle pain, fatigue, poor sleep, and poor cognition."  (Tr., p. 548.)  He further concluded that he believed Graham could not work a full-time job due her symptoms and fibromyalgia.

### *Physical Residual Functional Capacity Assessment*

State consultant Tisha Bailey completed a physical RFC assessment on April 14, 2011.  Bailey found that Graham had the following exertional limitations: she could occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand, walk, or sit for about six hours in an eight-hour work day; and engage in unlimited pushing and pulling.  Graham was found not to suffer from any postural, manipulative, visual, communicative, or environmental limitations. Bailey noted that Graham's medically determinable impairments of chronic fatigue syndrome, insomnia, lumbar small central disc protrusion, IC and IBS could reasonably produce some of her symptoms.  She also noted that Graham complains her bladder keeps her up at night and she has trouble standing and walking; but she

can prepare small meals, do own housework, drive, and go to church. Bailey found Graham's statements to be "partially credible" as there were some consistencies in her medical records; but that she could perform her past relevant work as indicated in the RFC. (Tr., pp. 89-96.)

### *Graham's Testimony at Administrative Hearing*

Graham testified at the administrative hearing on January 15, 2013, via telephone conference before the ALJ, with her counsel Therese Schellhammer, Esq. Graham stated she was currently 52-years old and lived with husband in West Davidson. She testified that she was 5'2' and 140 pounds. Graham had completed school through some of eleventh grade, but did not finish eleventh grade. She stated that her husband was the current source of income in the home, and that she received medical insurance through his company. (Tr., pp. 49-51.)

The ALJ inquired whether Graham had drawn unemployment compensation since she had stopped working, which she testified she had from the end of 2010 to about March or April of 2011. Graham testified that she had certified she was ready, willing, and able to work, and did complete a work search completing about 50 job applications. She further stated that she attempted to take a job shadowing a nurse practitioner during summer of 2012, but could only make it 8:00 to noon and did not get paid. (Tr., pp. 51-53.)

Graham stated that she had worked as a lab tech as Brost until October 2009. This job entailed taking patients back to be examined, giving visual acuity tests, taking blood pressure, taking pictures of their eye, fitting people for glasses, or teaching patients how to wear contacts. Graham also did books while at Brost and pulled charts that required getting some boxes off the shelves. She also described her job at the pharmacy, which she did before Brost. This job was originally to entail payroll and billing duties, but Graham stated she also did some pharmacy tech work including: counting pills, stocking shelves, giving blood pressures, filling medications, or making prescription deliveries. Graham had also previously worked in a doctor's office doing worker compensation exams for Immediate Healthcare. This job entailed billing, drug screens, initial care for patients that came in, giving some injections, and giving EKGs. Graham was the "liaison between the company and the insurance company." (Tr., p. 56.)

When the ALJ asked Graham to describe the most serious health problem that affects her ability to work, she first listed fibromyalgia. Graham testified that the fibromyalgia gave her "extreme pain," and that it caused her to take longer getting ready for things. (Tr., pp. 56-57.) She also stated that her fibromyalgia gave her anxiety and made lifting harder to the point that she "can barely life a gallon of milk." (Tr., p. 57.) Graham also testified that she has to wear big clothes and that she has fatigue associated with the pain.

Graham's attorney, Ms. Schellhammer, then questioned Graham regarding the pain stemming from her fibromyalgia in her neck and shoulders, knees, and left hip. Graham stated she had a varying degree of "nagging" and "sharp" pain in her neck and shoulders. (Tr., p. 58.) Graham testified this pain can vary due to stress or how tense she is, but that the pain is frequently a day-to-day occurrence. (*Id.*) To cope with the pain, Graham stated that she takes pain medication, uses muscle relaxers, massage the area, or uses heat. Graham also testified that she has "shooting" and "excruciating" pain in her knees that makes it hard to even squat down at times. (Tr., p. 59.) She tries similar treatments to cope with the pain, but stated that "it just doesn't really seem to touch the pain." (Tr., p. 60.) Graham described her left hip pain as "schiatic" that caused tingling and burning, and made it hard to sit or stand and caused problems when she is sleeping. (*Id.*) Besides the treatments used for her other pain, Graham stated her doctors have not prescribed or recommended any other treatments.

Ms. Schellhammer then questioned Graham on her problems associated with IC. Graham testified that she experiences symptoms involving frequency problems, that can range from every five to ten minutes or thirty minutes to an hour other days and also burning sensations. (*Id.*) Graham also stated that she can have "flares," which "feel like you're absolutely on fire." (Tr., p. 61.) She says to

help with flares, she takes Pyridium[7] or receives instillation treatments, but pain medication doesn't really help her symptoms.  Graham testified that certain dietary things could cause flare-ups, and she avoids such things as antibiotics or yellow die no. 10, but most of the time Graham does not know the exact cause of the flare-ups.  These flares, over the last six months, have occurred at least six times and will last anywhere from three days to a week.  (Tr., p. 62.)  When Graham is experiencing these flare-ups, she stated she is limited to sitting about 30 minutes and can only get up and move around no more than 30 minutes, and that she doesn't have much energy to use her arms or hands.  (Tr., pp. 65-66.)  Graham also testified doing basic chores, such as making the bed, sweeping, mopping, laundry, or ironing, are limited due to the pain from the motions and movements required to do such tasks.  (Tr., pp. 66-69.)  To try and help with these limitations in stamina and muscle strength, Graham stated she tries to do some exercises or swimming, but can only does so in small increments.

Graham testified that she will get out of the home to go grocery shopping, but that she goes with her husband because she has problems getting in and out of the car and walking around for too long.  (Tr., p. 71.)  However, Graham also stated that she will get out to do short errands.  Graham testified that due to her

---

[7] Pyridium is a medication used to relieve symptoms caused by irritation of the urinary tract such as pain, burning, and the feeling or need to urinate urgently or frequently. WebMD, "Drugs and Medications," http://www.webmd.com/drugs/2/drug-5661/pyridium-oral/details (last visited April 20, 2015).

condition she has had to modify her daily routine including the amount of medicine she has to take, the clothes she wears due to sensitive skin, and the types of tasks she can perform.

Graham stated that she experienced problems at her former job due to her condition, because she could not get the work done that she needed to with the amount of breaks she had to take or work she had to miss. Specifically, Graham testified she believed she was fired from her job at Brost vision center due to the amount of work she missed and would need to miss visiting her specialists in St. Louis. (Tr., p. 77.)

### *Vocational Expert's Testimony*

Vocational expert Elizabeth Clem also testified before the ALJ. Clem stated that optometrist technician is classified as sedentary skilled work; pharmacy technician is light semi-skilled work; and medical assistant in a doctor's office is light skilled work. (Tr., p. 82.) The ALJ asked Clem to consider a hypothetical individual with Graham's age, education, and work experience who could perform light work; never climb ladders, ropes, or scaffolds; could frequently climb ramps or stairs, balance, stoop, crouch, kneel, and crawl. Clem stated that, according to such functions and limitations and the Dictionary of Occupational Tittles, an individual could perform all past work. In the second hypothetical, the ALJ kept light work and no climbing ladders, ropes, or scaffolds, but changed the remaining

postural limitations to occasionally instead of frequently. Clem stated that with these changes, the individual could still perform past work. The ALJ then asked Clem whether from the first hypothetical posed if Graham's sedentary job was available, if light work was changed to sedentary and all postural limitations were occasional instead of frequently. Clem testified that a person could perform as an optometrist technician. Finally, the ALJ asked Clem to consider adding to the hypothetical work in a fixed location with access to a bathroom within 200 feet, that could be performed while wearing an incontinence protection pad. Clem testified the individual would still be able to perform past work under such restrictions.

Graham's attorney, Ms. Schellhammer, then questioned Clem on the ALJ's hypothetical that included sedentary work, occasional postural limitations, and fixed work site. Ms. Schellhammer added to this hypothetical that the individual would need to use the restroom as frequently as every 30 minutes, with breaks taking anywhere from five to ten minutes.[8] Clem stated that five minutes or less for such breaks would be acceptable for the past work described but that ten minute breaks every thirty minutes would interfere with job duties and ability to do all types of work activity. (Tr., pp. 85-86.) Ms. Schellhammer also added to the same hypothetical, an individual who on average would miss work three or more

---

[8] This was the length of time that Graham stated it generally takes her to use the restroom.

times a month.  Clem testified that, having that many absences on a consistent basis would also affect an individual's ability to maintain employment.

### III.    Standard for Determining Disability Under the Social Security Act

Disability under the social security regulations is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

The Commissioner, in determining whether a claimant is disabled, is required to evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a); *see also Cuthrell v. Astrue*, 702 F.3d 1114, 1116-17 (8th Cir. 2013) (general discussion of five-step analysis).

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the Commissioner cannot make a decision based on the claimants current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner determines whether the claimant can perform past relevant work. If the claimant can perform past relevant work, she is not disabled.

Finally, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the claimant is declared disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

### IV.     The ALJ's Decision

The ALJ determined that Graham last met the insured status requirements through December 31, 2012 and that she had not been engaged in substantial gainful employment since October 31, 2009. Therefore, the ALJ denied her claim as to anything before 2009, and evaluated the claim from that date forward.

At step two, the ALJ determined that Graham had the following severe impairments: irritable bowel syndrome, arthritis, and interstitial cystitis. 20 C.F.R. 404.1520(c). Although Graham alleged fibromyalgia as a severe impairment, the

ALJ determined this condition was non-severe "because it is only a slight abnormality and does not have more than a minimal effect on the claimant's ability to do basic physical or mental work activities." (Tr., p. 20.) The ALJ noted that Graham's fibromyalgia had been evaluated and treated, and could be medically managed with recommended treatment and medication. Furthermore, Graham had not sought aggressive treatment, and did not seek a rheumatologist until two years after it was recommended by her general practitioner. The ALJ also determined that Graham's medically determinable mental impairments of depression and anxiety were non-severe.[9] However, in determining Graham's residual functional capacity, the ALJ considered the functional limitations of all Graham's medically determinable impairments, including those that were non-severe. 20 C.F.R. § 404.1545.

At step three, the ALJ determined that Graham did not suffer from a combination of impairments that met or medically equaled the severity of one listed in the regulations.

At step four, the ALJ found that Graham had the residual functional capacity to perform light work, except she could not climb ladders, ropes or scaffolds; she could occasionally climb ramps and stairs; she could occasionally balance, stoop,

---

[9] The ALJ analyzed the four broad functional areas set out in the disability regulations for evaluating mental disorders under 20 C.F.R.§404.1520a(c)(2) to reach his conclusion that these impairments caused no more than "mild" limitation. Because Graham has not raised any issues with regard to this determination, I will not discuss it further.

kneel, crouch, and crawl; and she must work in a fixed location with access to a bathroom within 200 feet, where work can be performed while wearing an incontinence protection pad. The ALJ determined that Graham's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the RFC.

To support these determinations, the ALJ noted that Graham had collected unemployment benefits after the alleged onset date, and admitted to seeking out employment even though she alleged being unable to work because of her symptoms. This was found to be an acknowledgement by Graham that she had some capacity to work. Graham's testimony and function report were also considered, but were found to be less than fully credible because they were inconsistent with the medical records. Treatment records reveal that Graham's treatment for her symptoms were routine and non-emergency. These records further show that symptoms showed improvement through these treatments and that medical findings and tests did not mirror that type of pain Graham claimed to experience. Therefore, the ALJ found the objective medical evidence did not support Graham's allegations of the types of pain and intensity associated with her symptoms.

To determine Graham's RFC, the ALJ considered a *Treating Medical Source Statement* completed by urologist Dr. Steele, but gave little weight to this assessment and opinion. The ALJ reasoned that Dr. Steele's assessment was "conclusory and unsupported by the objective medical evidence." (Tr., p. 24.) Contrary to his assessment in the statement, Dr. Steele's treatment notes indicated that Graham's IC could be controlled by the treatments already being used.

The ALJ also considered the opinion and assessment by rheumatologist Dr. Di Valerio to determine Graham's RFC, but also gave little weight to his opinions. The ALJ reasoned that Dr. Di Valerio's assessments were also unsupported by the records, which showed that her "physical examinations were generally unremarkable." (Tr., p. 25.) While Dr. Di Valerio made extreme conclusions and limitations to Graham's abilities, his treatment records made findings that show normal range of motion and no positive tender points until March 7, 2012. Additionally, this opinion was given little weight because Dr. Di Valerio did not treat Graham until 2011.

After determining Graham's RFC, and relying on testimony of the vocational expert, the ALJ found that Graham could perform past relevant work as an optometrist technician, pharmacy technician, and medical assistant. He noted that Graham's RFC coupled with the physical and mental demands of these jobs did not undermine her ability to actually and generally perform these jobs.

## IV.  Standard of Review

The district court's role on review is to decide whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Id.*  If substantial evidence exists to support the Commissioner's decision, a court may not reverse merely because substantial evidence exists that supports a contrary outcome, or because the court would have decided the case differently.  *Toland  v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014).  Upon review, a court "must take into account evidence in the record that both supports and detracts" from the conclusion reached by the ALJ.  *Id.*

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

    (1) the credibility findings made by the ALJ;

    (2) the education, background, work history, and age of claimant;

    (3) the medical evidence from treating and consulting physicians;

    (4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

    (5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992).

## V.   Discussion

Graham argues that the ALJ erred by: (1) failing to account for additional evidence on the record; (2) assigning too little weight to the opinions of treating physicians; and (3) failing to properly consider Graham's fibromyalgia as a severe impairment at step 2 of the analysis.  I will address each of Graham's arguments in turn.

### A.  The ALJ's Decision Did Account for Additional Evidence Submitted to the Record

Graham alleges that new evidence submitted to the Appeals Council would have changed the decision of the ALJ, and therefore the decision is not supported by substantial evidence on the record as a whole. When new evidence is submitted to the Appeals Council that was not presented to the ALJ and the Appeals Council affirms the ALJ's decision, the court should review the ALJ's decision and determine whether the newly submitted evidence would have changed the ALJ's decision.  20 C.F.R. § 404.970(b); *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  The evidence must be considered by the court to determine that in light of such evidence there continues to be substantial evidence to support the ALJ's decision.  *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995).

The new evidence consisted of two additional bladder instillations to treat Graham's IC on May 1, 2012, and September 5, 2012. (Tr., pp. 549-64.) The Appeals Council did review the additional evidence submitted to them by Graham, as required by 20 C.F.R. § 404.970(b), but found that it would not have changed the ALJ's decision. (Tr., pp. 3-5.) In light of the additional evidence of two bladder instillations treatments following January 2012, I find the ALJ's decision is still supported by substantial evidence on the record.

Although the ALJ did note that no other treatment for IC after January 2012 was provided (Tr., p. 24), his finding that Graham was not disabled due to IC was supported by other substantial evidence on the record. The additional medical evidence provided by Graham of these procedures merely supplements the ALJ's inclusion of previous treatments of the same nature when considering the record as a whole. (Tr., p. 23.) The ALJ's decision already determined that Graham's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," and "the treatment records reveal claimant received routine, conservative, and non-emergency treatment since alleged onset date." (Tr., p. 23.)

Since the ALJ had already credited the use of these routine instillations in his decision and other evidence supported the ALJ's finding, and the medical records provide no other new medical evidence, the Appeals Council was not

required to make its own assessment of the additional evidence. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). Therefore, even with this additional evidence the ALJ's decision is still supported by substantial evidence on the record.

**B. <u>The ALJ Gave Proper Weight to Opinions of Treating Physicians</u>**

Graham contends that the ALJ failed to accord proper weight to the opinions from her treating physicians, specifically that he afforded too little weight in determining Graham's RFC. Generally, a treating physician's opinion will be given controlling weight as to the nature and severity of claimant's impairments, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); see also 20 C.F.R. § 416.927(c). However, the Eighth Circuit has cautioned that the opinions of a treating physician do not automatically control, as the record must be evaluated as a whole. *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012). Once the ALJ has reviewed the record as whole, he may decide to discount or disregard the treating physician's opinion if he finds other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). In determining whether to give a

treating physician's opinion substantial or little weight, the ALJ must always give good reasons for the weight he chooses to award. *Id.*

Graham contends that the ALJ gave too little weight to Dr. Steele's opinion as to the severity of her IC. The ALJ did not give Dr. Steele's opinion controlling weight because his assessment was "conclusory and unsupported by the objective medical evidence, notes showed that the claimant's interstitial cystitis was controlled with treatment," and was "inconsistent with other medical records." (Tr., p. 24.) Dr. Steele stated in treatment records that Graham felt treatments helped her condition and that she was doing better when receiving periodic instillations. Treatment records and medical source statements also state she does not have urinary incontinence. Further, Graham did not visit Dr. Steele for almost a year and half from 2009 to 2011, therefore any opinion on treatment and condition as to the examining relationship, and nature and extent of treatment carry less weight. 20 C.F.R. § 404.1527(c). Additionally, during this time Graham was not visiting her specialist for treatment and she was collecting unemployment benefits. *See Barrett v. Shalala* 38 F.3d 1019, 1023 (8th Cir. 1994) (court upheld ALJ's consideration of collection of unemployment insurance during period of claimed disability as inconsistency in record.) Therefore, when the physician's opinion is contrary to or inconsistent with the medical evidence as a whole, the ALJ may accord it less weight. *Halverson v. Astrue*, F.3d 922, 930 (8th Cir. 2010).

Even though Dr. Steele's opinion was accorded less weight, it was still considered within the RFC determination, seen by the limitation of "work in a fixed location with access to a bathroom within 200 feet." (Tr., p. 21.)

Similarly, Dr. Di Valerio's opinion was given "little weight because [the assessments] are unsupported by the evidence of record." (Tr., p. 25.) The ALJ's decision to afford Dr. Di Valerio's opinion little weight is supported by the fact that he did not treat Graham until September 14, 2011. This was long after he says her fibromyalgia was initially diagnosed in 2007, and two years after Dr. Steele recommended Graham seek treatment from a rheumatologist. (Tr., pp. 378-80.)[10] Additionally, while Dr. Di Valerio's opinions contain extreme limitations attributable to Graham's condition, his treatment records do not reveal evidence to support such conclusions until March 2012. *See Cline*, 771 F.3d at 1103 (treating physician's opinion afforded little weight because contradicted by own physical examinations and objective test results). Before March 2012, Dr. Di Valerio's treatment records did not indicate any tender points or remarkable concerns. Because of the inconsistencies in treatment records and opinions given by Dr. Di Valerio, the ALJ was entitled to afford lesser weight to his opinion and did not err. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009).

---

[10] Even if she may have been examined by a rheumatologist in November of 2009, that does not change the analysis because she did not undergo any treatment or have any follow-up visits with Dr. Bandlamudi.

Additionally, Graham argues that the *Treating Medical Source Statements* completed by Dr. Steele and Dr. Di Valerio should have been given greater deference in determining her RFC. While the ALJ did consider these statements in his determination, "the checklist format, generality, and incompleteness of the assessments limits [the assessments'] evidentiary value." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (*citing Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)). Also, the two physician's statements were inconsistent with each other on different physical limitations. These inconsistencies include: Graham's ability to sit and stand, and her ability to push/pull, climb, bend/twist, balance, or drive machinery. (Tr., pp. 452-60.) Even with these inconsistencies, the ALJ did still include some of the physician's opined limitations in the RFC determination. The RFC included the inability to "climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; she can occasionally balance, stoop, kneel, crouch, or crawl." (Tr., p. 21.) So while the ALJ was not obligated to give these conclusory limitations great deference, he still took it under consideration and applied portions of these opinions in determining the RFC.

Dr. Di Valerio also wrote a letter that opined that Graham was "unable to do meaningful work." (Tr., p. 548.) However, the Eighth Circuit has held that a treating physician's opinion that claimant cannot be gainfully employed or is disabled "gets no deference because it invades the province of the Commissioner

to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). So, while the ALJ did review this letter on the record, this unsupported opinion was not entitled to controlling weight. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

The ALJ's decision to afford little weight to the opinions of the treating physician's opinions is supported by "some evidence in the record." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).

## C. The ALJ Properly Characterized and Considered Fibromyalgia at Step 2

Finally, Graham argues that the ALJ erred in finding that her fibromyalgia was not a "severe impairment" under step 2 of his analysis. An impairment is not severe when it would cause no more than a minimal effect on claimant's ability to work. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Graham bears the burden of demonstrating that her fibromyalgia constituted a severe impairment within the standard set by 20 C.F.R. § 404.1521(a). *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

As discussed above, Dr. Di Valerio's opinion of Graham's fibromyalgia was held suspect because it was not consistent with his treatment records. This is evidenced by the lack of tender points or problems in range of motion, until the time that Dr. Di Valerio began completing the forms for Graham's social security claim.

Also, Graham did not seek treatment for this condition from a rheumatologist until September 2011, even though she reports that this condition was diagnosed in 2007. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (claimant's failure to seek treatment may indicate the relative seriousness of a medical problem, especially in instances where medical evidence is conflicting). Although Graham continued to assert problems from her fibromyalgia, treatment from Dr. Di Valerio was infrequent, and she had long intervals that separated visits to Dr. Di Valerio or her other physicians. *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (infrequent treatment in record can support a finding that condition is non-severe).

The ALJ also properly considered fibromyalgia in his determination of Graham's RFC, as required by regulation. 20 C.F.R. § 404.1545 (the ALJ will consider all your medically determinable impairments including those that are not "severe" when assessing residual functional capacity).

The inconsistencies in the record and lack of treatment for her condition, provide evidence to support the ALJ's determination that Graham's fibromyalgia was not a severe impairment and does not alter the ALJ's RFC determination.

## VI. <u>Conclusion</u>

Based on the foregoing, I conclude that there is substantial evidence on the record to support the Commissioner's decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this <u>14th</u> day of July, 2015.